# PERINI & HOERGER
ATTORNEYS AT LAW
1770 MOTOR PARKWAY
SUITE 300
HAUPPAUGE, NEW YORK 11749

RAYMOND G. PERINI                                                                              (631) 232-2224
MAUREEN S. HOERGER                                                        FAX  (631) 232-2344
_____

Michael Castronovo
Michael M. McClellan
Of Counsel

                                                                          January 20, 2012

Hon. Arthur D. Spatt
United States District Court
Eastern District of New York
Federal Courthouse
Central Islip, NY 11722

        Re:    **United States v. Arthur Bielli**
                  **CR-08-381(ADS)**

Dear Judge Spatt:

      Attached please find our brief regarding the unresolved matter of the loss figure and restitution figure claimed by Aenos Towing, which was the subject of a Fatico hearing.

      As the court is aware, all the other complainants have reached reasonable resolutions, with the loss currently at $909,093.

      Aenos Towing still contends that the defendant is responsible for approximately $5.1 million dollars in losses. The defense contends that, at most, they lost one or two premium payments worth from $5,000 to $10,000 as a result of the defendant's conduct, and further that even that is not fully substantiated because no proof was offered as to why or when the deficiency arose to the insurer (AIU) that dropped their coverage, nor what payments were received by AIU.

      Therefore, we urge the court to determine the loss and restitution figure in accordance with the rational basis that all the other complainants have accepted—lost premium payments, uninsured accidents and consequential damages flowing from resolving those accidents.

      Thank you for your patience and attention to the matter.

                                                               Sincerely
                                                               Perini & Hoerger

                                                               Raymond G. Perini

Cc: AUSA Charles Rose by ecf

*1*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA

    -against-　　　　　　　　　　　　　　　　-Cr. No. 08-381(ADS)

ARTHUR BIELLI

------------------------------------------------------x

DEFENDANT'S MEMORANDUM OF
LAW REGARDING FATICO HEARING

                        PERINI & HOERGER
                        ATTORNEYS FOR DEFENDANT
                        1770 Motor Parkway
                        Hauppauge, New York 11749
                        (631) 232-2224

TO: HON. LORETTA LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK
BY AUSA CHARLES ROSE
FEDERAL COURT HOUSE
CENTRAL ISLIP NY 11722

## Introduction

Pursuant to the plea agreement, the defendant sought a *Fatico* hearing, challenging the loss calculations of the Probation Department regarding Aenos Towing. As a result of negotiations, the defendant and the government agreed to a loss of $909,093 for all other complainants. These represented actual out of pocket losses to the victims. Prior to stipulation and testimony at the *Fatico* hearing the Probation Department had valued the loss of the complainants at $9,735,276.56., including Aenos Towing.

The defendant's contention is that the loss to Aenos Towing, currently listed by the Probation Department as $5,142,776.56, is extremely exaggerated. The Probation Department itself acknowledges that the figures submitted by Aenos Towing may have been "overstated." (See Pre Sentence Report paragraph 79)

The defendant believes the court should give Aenos Towing a loss of zero, or at most one or two premium payments, about $5,000 to $10,000. Aenos Towing should not be entitled to receive any credit for loss of its projected contract revenues. Aenos was awarded its New York City Department of Finance towing contract based on fraudulent misrepresentations and sought a second contract on the same basis. It had not yet even obtained this contract when it failed.

Further, Aenos Towing failed to produce any documents substantiating a February 2004 premium payment it claimed it made to the defendant that resulted in the cancellation of Aenos Towing's insurance. And finally, Aenos Towing did not lose the New York City contract because of the defendant's actions, rather they lost the contract by their own failure to run a profitable business and pay their bills.

## FACTS

The complainant, Ivan Moreno, claimed losses to the United States Probation Department of approximately $5 million dollars in future earnings, without any consideration of the cost of producing those revenues. The complainant and the government contend that the complainant's projected loss was entirely attributable to the defendant's conduct, which resulted in Aenos Towing's registration suspension on March 18, 2004 due to insurance lapse. (Government Exhibit 1)

The complainant testified that he was awarded a towing contract in New York City by getting preference due in part to a Women's Business Enterprises (WBE) program.  Moreno was not qualified for the contract due to his bad credit, including tax liens, and various other financial problems. The name "Ivan Moreno" appears nowhere on the bid sheet. Moreno testified that his sister, the purported owner did no work and had no involvement in Aenos Towing as required to receive a preference for a Woman's Business Enterprise. (Government Exhibit 2) (Hearing Transcript page 225 Line 10-12)

Included in his projected losses was a second contract, which he had not yet obtained. Presumably he would make additional fraudulent representations to New York City to obtain the second contract. Moreno stated on the witness stand that Aenos was found to be an "eligible bidder" for this contract. (Hearing Transcript page 71 Line 7-10)

However, had the New York City Department of Finance found out that Moreno lied on his initial contract he would have never been awarded the first contract for the Brooklyn A.M.

tour, and certainly would not have been awarded a second contract covering tow jobs in Manhattan and the Bronx under a Woman's Business Enterprise program.[1]

Upon being awarded the first contract, Ivan Moreno testified he opened a Chase Business Checking account, admitting in the bank paperwork that he was 100 percent owner of Aenos Towing. He also listed himself as the President of Aenos Towing. (Defendant Exhibit Z)

Aenos Towing's Chase Account was opened solely to deposit the funds Aenos Towing received from its city contract. It is clear from his testimony that Ivan Moreno ran the day to day operations of Aenos Towing and should have been listed on the New York City bid as the President of Aenos Towing.(Hearing Testimony Page 194 Lines 13-16)

Despite his projections of five million dollars revenue to the Probation Department, Moreno was forced to admit the business did not generate any actual profit. Moreno told the court he paid himself wages in the amount of $500 to $1,000 per week ($25,000-$50,000) per year. That was essentially all the business generated. (Hearing Testimony Page 290 Line 4, and Page 288 Lines 11-14)

The complainant also testified that he did not pay any income taxes for 2002 and 2003, but rather was assessed later and subject to a still pending payment plan. (Hearing Testimony Page 168 Line 2-8)

In addition, by the end of 2003, Moreno was sued by Discover Card for debts on two separate accounts and had numerous overdrafts on the business checking account at Chase Bank. The failure to pay his taxes, his credit cards, and various other tax liens demonstrates Moreno's lack of cash flow and inability to pay Aenos Towing's bills. (Defendant's Exhibits AL 1-5, AM)

---

[1] *Fraudulently representations on similar bid proposals have been the subject of numerous prosecutions in the Eastern and Southern District of New York. See U.S. v Ruggiero, 05-cr-00229, U.S. v. Desio 2011-cr-00292, U.S. v. Hotton, 2003-cr-00874, U.S. v. Jiminez 2011-cr-00857, U.S. v. Hamilton, 2001-cr-01143*

Despite the government's contention that on the last day of several, specific months, Aenos had a positive checking account balance, evidence showed within the next two or three business days these funds were completely dissipated by outstanding bills.

The Chase bank statements list the daily balances and the daily balances show a company barely able to cover its expenses.  The true picture of a company,  was that of one marginally funded. (Government Exhibit Chase Bank Accounts 3-13)

Other evidence showed the company's inability to make a profit resulted in paying its "scouts" as independent contractors instead of as employees. Aenos did not pay FICA and employment taxes. Moreno testified that he supplied the scouts with regular assignments, equipment and all the employees acted at his direction. These "scouts" should have been paid as employees and not 1099's but Aenos did not have the revenue to pay them properly. (Page 54-55 Lines 11- 25 and 1-17)

With the bills adding up Moreno chose to play "a game of tennis" with the landlord over a $4000 architect's bill for designing a curb cut at his Brooklyn location. (Hearing Transcript Page 326 Line 15)

For over a year Moreno failed to pay the architect who completed the work. (Government Exhibit 77) Despite his claims that the landlord should pay, Moreno eventually admitted on cross-examination that it was his obligation. (Hearing Transcript Page 205 Line 25, Page 327 Line 4-5 and Line 9-11)

Subsequent to receiving a Notice of the Mechanics Lien from the architect, the landlord gave Moreno a 30-day Notice to Cure.  (Government Exhibit 77). Despite the landlord's clear intention to evict Moreno if he failed to pay this lien, Moreno chose not to (or could not) pay his obligation to the architect.

In a letter dated July 1, 2004 the New York City Department of Finance terminated Moreno's contract "due to the loss of the yard". (Government Exhibit 69) The failure to pay the architect who completed work on Moreno's yard, leading to the eviction from the yard had nothing to do with the defendant's actions.

On direct examination, and during cross-examination Moreno disputed that architect's lien was the reason he lost the City Contract and his yard. However, Moreno and the government failed to produce any documents to contradict Government Exhibit 69, and the defense's evidence that the architect's lien caused the eventual termination of the lease and the City contract.

While Moreno alleged that Mr. Silverman, owner of the property, told Moreno that he was being evicted for the failure to pay rent of approximately seventy five to one hundred thousand dollars, the government did not produce any demands for rent, nor documents from Moreno's landlord-tenant attorney to substantiate Moreno's claimed.(Hearing Transcript Page 129-131)

In regard to the losses created by the defendant's conduct, the complainant claimed that the lapse of insurance in February 2004 caused him to lose his fraudulently obtained contract, and the subsequent anticipated contract and revenue to be received through the fraudulent representations by the complainant.

Although the government brought out a July 2003 lapse in insurance on direct, it failed to bring out the persistent pattern of late payments to the defendant and to Florida Funding by Aenos. The defense demonstrated, through written evidence, that Aenos constantly received reminder notices from the defendant to make timely payment, and constant cancellation notices for not doing so.

In fact, in July 2003, the complainant's insurance policy had to be replaced due to his own late payments, not because of the defendant failure to remit to the carrier.

Several documents introduced into evidence on cross-examination established that throughout 2003 Aenos Towing was repeatedly in danger of cancellation, or lapse, due not to defendant's conduct, but due to the complainant's persistent late payments. In April 2003, Aenos received a cancellation notice by fax from the defendant. The complainant continued this pattern of late payment into 2004. The first payment of 2004 was late and was made on January 26, 2004. (Defendant's Exhibits C,E,F,N,T)

The defendant contends that the complainant never made the February 2004 payment at all. It should be noted that the Suffolk County District Attorney's office executed a search warrant at the defendant's premises in February of 2004 and took most of his records. Thus, this explains the defendant's failure to dun Aenos Towing for the late payment the last week of February 2004. The evidence suggests that without dunning notices, Aenos could not be relied on to make timely payments or payments at all.

There is further evidence the complainant never made the February payment. Moreno told the court that he compiled documents to give to his attorney Gary Rosen to fight the New York State Department of Motor Vehicles (DMV) suspension of his registrations on March 18, 2004. Rosen took the materials Moreno gave him and submitted a letter to DMV on April 12, 2004. (Government Exhibit 60)

Rosen's letter details the various payments made by the complainant to the defendant and to Florida Funding. However, in his first letter, Rosen does not claim that Moreno made a February 2004 insurance payment.

Despite having listed all of the other payments made by Aenos Towing, there is no mention of the three supposed cash payments made in February 2004 to the defendant. The letter mentions the March 2004 payment for a replacement policy, (as a result, of course, of the cancellation for nonpayment, similar to the situation in July 2003). But it is significant on such a critical issue, the March 18, 2004 suspension for insurance lapse due to non-payment, Moreno's attorney fails to assert that Moreno made these three February payments to the defendant.

Apparently, after further discussions with the DMV and his attorney Moreno was required to come up with some proof of payment for the February 2004 premium. Moreno testified to a February 2004 payment by cobbling together some already existent checks to "cash", and a phantom "petty cash" amount.

Moreno testified that his brother, at his direction, in order to pay the February payment wrote two checks to "cash" on February 13, 2004 for $1,112.25 and $1,342.59. (Government Exhibit 32 B and C)

Five days later he gave his brother $2,645.00 in petty cash and all this cash was then taken to the insurance company to pay the premium in cash. He claims that contrary to all the other previous and subsequent payments, the defendant required this payment be made in cash and of course was not issued a paid receipt by the defendant.

Additionally, Moreno's testified that he had no involvement in the bookkeeping operations and relied on his brother to keep the books of the company. (Page 194 17-19 and Page 236 Line 16 and 17)

However, regarding this specific payment he has full recollection of the payment, and for the first time, that the defendant requested Aenos Towing to bring cash for the insurance premium payment. Moreno's failure to tell his attorney about any payments in March 2004

when they were writing the first appeal to the DMV to lift the suspension, and failure to provide his attorney with any documentation of the February 2004 payment at that time, was unexplained.  All payments Moreno made would naturally be expected to be included in the April 2004 letter to DMV so that Aenos Towing's registrations could be reinstated. Most especially the payment in February 2004 that allegedly the defendant failed to pay over, which caused the lapse.

Not until Rosen's second letter on May 25, 2004 did the complainant provide his attorney with the three February cash payments story. DMV did rescind the suspension on the Aenos's vehicles on June 4, 2004. (Government Exhibit 71)

The defendant contends that these cash payments were never made or Moreno's attorney Rosen would have included them in his first letter to DMV on April 12, 2004. (Government Exhibit 60)

Further demonstrating a fabrication, Moreno failed to produce a single fax, or letter of protest to Bielli regarding the cancellation of his policy in February 2004, and the subsequent additional money Aenos was required to pay to the defendant to secure a new policy with Comfort Zone.

Moreno failed to produce a cash receipt from defendant for the February payments. Neither of these check amounts to cash bears any relationship to the amounts of previous payments for insurance premiums. The complainant failed to bring in his brother George to confirm that he received the "petty cash", or that he delivered money to the defendant, or explain the absence of a receipt.  Moreno's testimony was inconsistent with all of the documents including the April 12, 2004 letter created by his own attorney to DMV.

While the cause of the cancellation was a deficiency to AIU in the amount of $15,000-16,000 the government failed to bring a witness in from AIU to state why there was a deficit. It was not proven that the deficit was caused by the failure to remit payments, or by a reassessment of the cost of the policy by AIU or by a failure to cancel the policy, or by payments missed in earlier months. Further, it was never even proven the defendant did not pay AIU in February 2004.

Therefore, the government has not attributed any of the complainant's losses to the defendant's conduct of conviction.

## LEGAL ARGUMENT

### POINT ONE
### AENOS SUFFERED NO REASONABLY FORESEEABLE PECUNIARY HARM RELATED TO THE OFFENSE CONDUCT.

The defendant concedes that appropriate losses in a case such as this would be stolen premium payments, losses flowing from unremitted premiums,-- uninsured accidents or property losses --and the consequential legal expenses in defending such claims and paying claims or replacing the lost property, as well as interest on premiums finance agreements for insurance that was never provided. The government has not produced any evidence of unremitted premiums, uninsured accidents, property loss nor consequential legal fees paid on behalf of Aenos Towing.

Under U.S.S.G. 2B1.1 App. Note 3 "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from an offense. Under App. Note 3(iv) "Reasonably foreseeable pecuniary harm means pecuniary harm that the defendant knew or under the circumstances reasonably should have known was a potential result of the offense." (2010 Guideline Manual)

That the complainant lost a contract he was awarded by fraud, that he ran a grossly underfunded business where, in order just to survive, he had to not pay taxes, pay employees as independent contractors, not pay legitimate bills he incurred to professionals, allow liens to be placed on the landlord's property, habitually pay his required insurance payments late, was not caused by the defendant's conduct. Yet these were the proximate causes of the loss of his business, not a lapse in insurance, which was not clearly shown to have been caused by the defendant.

The complainant's Chase banking statements clearly reflects a company that had high bills and was underfunded. Ultimately it was not the defendant's misconduct that caused the complainant to lose his business rather it was the high costs associated with running Aenos Towing.

Furthermore, the loss of potential revenues, including revenues from a contract that the complainant had not yet even fraudulently obtained, is not an actual loss. The potential actual loss from this would be at most the profit generated, not the gross revenues, and here there were no profits. All the money the complainant took out of the business was the result of shorting other bills—the architect, the insurance company, the scouts, Discover card etc.

Aenos Towing was paid by the New York City Department of Finance for all the work it *actually completed*. Thus, it suffered no *actual loss* from the discontinuance of its business, only future loss.

What it is claiming as loss is the future gross revenues on a contract it received by fraud and a second contract it had not yet even obtained. Aenos's calculations show no reductions for operating expenses which clearly equaled or exceeded potential revenue. The losses claimed by

Aenos Towing do not reasonably flow from the conduct that resulted in the defendant's conviction.

In *United States v. Needle* 72 F.3d 1104 (3rd Circuit 1995), the defendant applied for an insurance license in the Virgin Islands. As a requirement for the license the defendant needed to possess a specific amount of initial capital. Without the required capital the defendant would not have been licensed. The defendant fraudulently misrepresented his initial capital to the Division of Insurance of the Virgin Islands and obtained the insurance license. As a result of a hurricane the defendant was than required to pay out insurance claims. The defendant claimed at sentencing that an Act of God was responsible for the loss. The defendant asked the court to reduce his sentence because his misrepresentations had nothing to do with the hurricane that caused the loss to the victims. As a result of his lack of capital the defendant was unable to pay out all of his insurance claims. The court held that the losses of the victims were reasonably foreseeable to the defendant at the time he made the misrepresentations. The victim's losses were reasonably foreseeable to the defendant because the defendant should have anticipated having to pay insurance claims from a hurricane.

Unlike *Needle*, the defendant could never have foreseen the losses that Aenos has claimed. The defendant was not privy to the day to day lack of financing that Aenos had. The defendant certainly could not have been responsible for Aenos Towing incurring a property lien that ultimately led to the owner of the property evicting Aenos Towing. The defendant secured insurance for Aenos Towing. Aenos Towing's continuous failure to pay their bills on time led to an insurance cancellation in June 2003, and cancellation and then a reinstatement of its registration in June of 2004. The fact that Aenos Towing ultimately went out of business was not the fault of the defendant, rather it was their own lack of funding.

**POINT TWO**

**AENOS TOWING SHOULD BE ESTOPPED FROM CLAIMING FUTURE EARNINGS ACHIEVED DUE TO FRAUD**

Litigants are estopped from claiming a depravation of illicit profits by the equitable doctrine of "unclean hands." The doctrine of unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65.S.Ct. 993 (1945).  The doctrine has applied in virtually all circumstances of inequitable conduct throughout the history of the American judiciary. See for example *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879 (1995) (inequitable conduct perpetrated by employee affected remedies under Age Discrimination in Employment Act (ADEA), *R.H. Sterns Co. v. United States*, 291 U.S. 54, 54 S.Ct. 325 (1933) (inequitable conduct by tax litigant estopped litigant from claiming illegal tax assessment), *Manhattan Medicine Co. v. Wood,* 108 U.S. 218, 2 S.Ct. 436 (1883) (incorrect designation of origin on trademarked goods estopped one litigant from alleging same in infringing product).

Here, Moreno admits to an enterprise which nominated his sister as "president" of Aenos Towing for the purpose of fraudulently obtaining two New York City Towing contracts. Despite the fact that Moreno's sister had no ties to the corporation, she was listed to obtain unearned preferential treatment in deference to her status as a female minority "business owner." Moreno further testified that he would not have received the contract without such deference. Aenos Towing was never a viable entity and only received work from the City of New York by open and notorious deception.

Moreno now approaches the Court to claim future "damages" from this illicit contract. While the rules of estimation under Fatico are broad, they cannot be so broad as to include money that was slated to be stolen from the City of New York.  Moreno is estopped from collecting damages by his own fraudulent behavior.

## **CONCLUSION**

The court should limit Aenos Towing's losses to actual losses that have been proven such as stolen premiums or uninsured accidents and none have been proven. To do otherwise would not only reward misconduct, but diminish the pool of funds for restitution available to victims who have proved actually and not speculative losses.

Dated: Hauppauge, New York
January 20, 2012

RESPECTFULLY SUBMITTED,

_____
Maureen S. Hoerger

_____
Michael Castronovo

Perini & Hoerger
1770 Motor Parkway Suite 300
Hauppauge, New York 11749
631 232 2224