UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,                              **MEMORANDUM OF**
                                                       **DECISION AND ORDER**
               Plaintiff,
                                                       08-CR-0381 (ADS)
   - against -

ARTHUR BIELLI,

               Defendant.
-------------------------------------------------------------X

**TO :**

    **LORETTA E. LYNCH**
    United States Attorney for the
    Eastern District of New York
    610 Federal Plaza
    Central Islip, NY  11722
    By:   Carrie Capwell, Esq.,
           Assistant U.S. Attorney

    **PERINI & HOERGER**
    Attorneys for Defendant
    1770 Motor Parkway
    Hauppauge, NY  11749
    By:   Raymond G. Perini, Esq.
           Of Counsel

    **U.S. PROBATION DEPARTMENT**
    Eastern District of New York
    202 Federal Plaza
    Central Islip, NY  11722
    By:   Amrita Ashok
           U.S. Probation Officer

**SPATT, District Judge.**

This opinion follows a <u>Fatico</u> evidentiary hearing, held before the Court on October 28, 2011, November 1, 2011, November 3, 2011 and November 10, 2011.

In the sentencing context, where there is a dispute as to any factor important to the sentencing determination, there shall be an "opportunity to present information to the court regarding that factor." United States Sentencing Guidelines § 6A1.3. The resolution of such a disputed factor is provided for in the aforementioned guidelines, as follows:

**§ 6A1.3. <u>Resolution of Disputed Factors</u> (Policy Statement)**

(a) When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

(b) The court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(I), Fed. R. Crim. P.

As to the <u>Fatico</u> hearing held to resolve disputed sentencing factors in this case, namely, the amount of the loss and restitution – the standard of proof on the part of the government to prove the amount of the loss is the preponderance of the evidence. As stated in <u>United States v. Martinez</u>, 525 F.3d 211 (2d Cir. 2007): "This court has determined that, '[j]udicial authority to find facts relevant to sentencing by a preponderance of the evidence survives <u>Booker</u>.'" <u>Id</u>. at 215 (quoting <u>United States v. Garcia</u>, 413 F.3d 201, 220 n.15 (2d Cir. 2005)). Also, it has long been established that a district court may consider heresay evidence in a <u>Fatico</u> hearing, if the evidence is of sufficient reliability. <u>United States v. Martinucci</u>, 561 F.3d 533, 535 (2d Cir. 2009); <u>United States v. Martinez</u>, 413 F.3d 239, 242 (2d Cir. 2005).

# I. **THE FATICO HEARING**

Ivan Moreno is presently a tow truck operator. From 1998 to 2004, he was an owner of a towing company, called Aenos Towing and Recovery, Inc. ("Aenos" or "Aenos Towing"). He and his late brother Renato purchased the company in 1998 for approximately $125,000. The business included three trucks. The company did "tow-truck" work for taxi companies and parking garages. In 2000, Aenos applied to provide towing services for the New York City Police Department within the confines of the 114th and 115th Precincts in Astoria, Queens. Aenos obtained that contract with the New York City Police Department in March of 2003. The contract involved the pickup of derelict vehicles and stolen vehicles. Aenos trucks would tow these vehicles to its holding yard in Astoria where they would be kept for about 15 work days. For this service, Aenos was paid about $80 per car. Aenos would be paid more if the owner claimed the vehicle prior to the 15 day period. There was about a 30 percent owner redemption rate and a 70 percent transporting of the vehicles to the City owned facility.

Aenos also did towing work for small motor clubs and was paid $40 to $100 per vehicle for that service. Aenos Towing did about 100 of those service jobs per month.

In March 2004, the Aenos insurance on all of its vehicles "was taken away" and Aenos Towing could not operate and had to pull its trucks off the road. At that point, the Aenos Towing business ended. Explaining further about the City contract, Moreno stated that the term was for 3 years and 45 days. The agreement with the City is in evidence as Government Exhibit 2. In the contract, the City estimated that there would be 8,850 cars towed per year, at an estimated price of $3,517,875 for the 3 year duration of the contract. Also, there was an estimated aborted tows of 950 cars per year at an estimated price of $162,450 for the period of the contract. So that the total three

year bid price for the Brooklyn day tow shift was the sum of $3,680,325. In addition, there could be extra bonuses if the number of vehicles exceeded the target numbers.

The agreement between Aenos and the City commenced on March 10, 2003. Aenos had to lease a large yard to accommodate "at least 1,000 cars." Aenos leased property on Kent Avenue in Brooklyn from Ninth Street Equities and Louis Silverman. Aenos had to make improvements to the leased yard, including fencing in a square block and providing a curb cut. This work cost Aenos about $7,000 to $8,000 and approximately $10,000 in material. The rental for this large yard was about $25,000 per month. In addition, to perform the City contract, Aenos had to purchase a trailer for an on-site office on the Kent Avenue property for about $6,000 and "about" five new 2008 tow trucks including one flatbed truck. The cost was about $25,000 to $30,000 for the smaller tow trucks, $45,000 for the medium tow truck and about $60,000 for the flatbed truck. Aenos financed the purchase of the trucks and paid a down payment of between $20,000 to $30,000, with monthly payments on the financing of the vehicles of between $5,000 to $7,000 per month.

Aenos needed insurance coverage for these new vehicles. Moreno was recommended to an insurance broker named Arthur Bielli whose company was named Cross County Insurance Brokerage Inc. ("Cross County") located in Ronkonkoma, New York. On December 2, 2002, Cross County gave Aenos a quote as to insurance fees for 2003. (See Govt. Ex. 15). The quote was for six 2003 vehicles for commercial auto liability insurance for a total premium of $42,000, which was a "fantastic" premium, compared to other quotes he had received from insurance brokers. Aenos decided to use Cross County as its broker. On December 8, 2002, Aenos Towing sent a check to Cross County in the sum of $12,400 for "truck and property insurance." The monthly insurance premiums were "in the range of $4,000 - $5,000." Some of the insurance premium monthly checks

went to Cross County, a "couple" went to Florida Funding Associates and one or two checks went directly to the insurance company. Moreno understood that the insurance company involved was called AIU Insurance Company, or so "he believed."

So that prior to the start of the Aenos Towing contract with the City on March 10, 2003, Aenos had its new tow trucks; its new yard in Brooklyn; and its insurance coverage for the trucks and the property. Moreno described in detail the towing services provided for the City by Aenos in 12 hour shifts starting at midnight. Aenos was paid weekly by the City of New York and, for example, made weekly deposits in November and December 2003 of $25,000, $23,000, $18,000 and $33,000. Aenos also earned "a couple of thousand per month" from the City Department of Sanitation for towing vehicles for that Department. Aenos also did work in the Sheriff's Manhattan PM Tour two days a week. He was still working in the Manhattan PM on a provisional basis two days a week in March of 2004 when Aenos Towing had to pull all their trucks off the road.

Moreno described the events of March 2004, when the City found out that Aenos Towing had no insurance and the vehicles had no registrations. Moreno learned that all of his trucks had insurance suspensions and he claims that he almost had a heart attack that day. At first he disputed this occurrence, saying "it can't be happening." However, punching into the computers, the response was "invalid, invalid" and "suspensions." Moreno arranged to have another private contractor do the Aenos Towing work for that day.

Moreno and his brother attempted to contact Bielli or his company. It was 2 or 3 o'clock in the morning and their calls went to voice mail. They left messages with Bielli. As soon as the sun came out they went to Bielli's office. Bielli wasn't there. The next day Bielli called and said "there was a problem with the computers up in Albany. You are fully insured." Bielli assured Moreno that

5

Aenos Towing had insurance on all their vehicles. However, on March 18, 2004, Aenos received a communication from Kim of Cross County, stating:

| Company: Aenos Towing | Attn: George & Ivan |
|---|---|
| From: Kim | Date: |
| Phone: | Fax: |
| Re: Check | CC: |

☐ Urgent   ☒ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Please be advised that coverage has been bound for your trucks and a deposit check needs to be picked up from you today or I cannot hold the coverage.

Please advise.

(Gov't Ex. 57).

Then, the next day, on March 19, 2004, Aenos received another communication from Cross County, stating as follows:

> March 19, 2004
>
> Aenos Towing Inc.
> 11-06 Broadway
> Long Island City, NY 11106
>
> To Whom It May Concern:
>
> Please be advised that Aenos Towing Inc. has insurance on all of their trucks and is in full force. If you have any questions, please call the office at 631 588 2228.
>
> Thank you
>
> Lisa

(Gov't Ex. 58).

Prior to these occurrences, on August 4, 2003, Aenos had sent a suspension order from the

State of New York dated July 1, 2003 stating to Global, "Please follow up today." (Gov't Ex. 46). The suspension order stated: "Failure to maintain continuous liability insurance coverage." Another suspension order was also received on September 29, 2003 and Aenos sent a fax to Lisa of Cross County stating:

| Suspended Reggie |
| --- |
| 14084 |
| 22720 |
| 24687 |
| We need a restoration order from Albany, its very important |

(Gov't Ex. 50).

In March 2004, Aenos had to pull all their vehicles off the road due to lack of insurance and suspended registrations. All the Aenos trucks were in the Kent Avenue yard by the end of March 2004. Aenos was not able to perform any towing services. As a result, the City then gave the Aenos Towing contract to another company. However, at that point, at the end of March 2004, the City did not terminate the contract with Aenos. Moreno contacted the AIU Insurance Company and was told that he had to pay a premium before he could start his insurance. There was "an old premium that was never submitted by my former insurance company," (Tr. at 101), meaning Bielli's company. AIU wanted $15,000 to $16,000 in back premiums. Bielli's firm failed to pay the insurance premiums to the AIU Insurance Company. Aenos Towing advised the City that they were a "victim of fraud through our insurance broker." (Tr. at 108).

Aenos Towing made substantial efforts to rectify this situation, apparently without success. In April and May 2004, Aenos received no income, except for the pre-March 2004 towing work, but no new income. Aenos could not pay the Kent Avenue yard monthly rent of $25,000.

In early June 2004, Moreno learned that the Aenos suspensions were lifted with regard to

his registrations. However, Aenos still could not resume its towing operations "because there was still money owed from back premiums to the insurance company." (Tr. at 124). So that in early June 2004, Aenos still did not have valid insurance on any of its trucks. In addition, it owed the Kent Avenue landlord several $25,000 monthly rental payments. Also at that time, Aenos had fallen behind in its payments on the trucks to the finance company. Further, the landlord of the Kent Avenue property started eviction proceedings. On June 22, 2004 the landlord served a notice of eviction. (Govt. Ex. 76). Also, landlord Silverman went directly to the New York City Finance Department to attempt to seize and collect any money due to Aenos Towing.

On July 1, 2004, the New York City Department of Finance terminated their agreement with Aenos Towing and Recovery Inc. as of July 7, 2004. (Gov't Ex. 69). Aenos removed their tow trucks from the Kent Avenue yard, which was padlocked by the landlord. Ultimately, Aenos surrendered the trucks to the finance company and sold two older trucks. Of importance, Moreno and his brother George prepared a list of the losses Aenos sustained by reason of the termination of the City contract for the 27 month period remaining on the contract. (Gov't Ex. 1). The total projected loss for the estimated 8,850 vehicles that would be towed per year, was the sum of $5,145,276.56.

After Aenos Towing shut down, Moreno got a job as a dispatcher for a cab company, and then as a driver for a tow truck company.

On cross-examination, Moreno conceded that he didn't file personal federal, state and city tax returns for the years 2002, 2003 and 2004. During these periods he was earning between $50,000 and $75,000 per year and paying no income tax. Also, there were judgments against him for failure to pay on his two Discover credit cards. In addition, there were federal tax liens filed

against Aenos in 2002 and 2004. In particular, there was a recorded lien against Aenos Towing of $12,490 on February 2, 2004. Also in evidence is a warrant against Aenos Towing from the New York State Taxation and Finance Department for the period ending May 31, 1999, in the amount of $3,114, (Dft's Ex. AK), in addition to a series of other warrants filed against Aenos.

There was also testimony about the problem Aenos had with the landlord of the Kent property with regard to a mechanics lien filed against Aenos. The defendant seems to assert that the Aenos business was terminated because of the Kent Street mechanics lien, rather than the lack of insurance coverage. The Court disagrees. The City suspended and then cancelled its contract with Aenos because of the lack of insurance coverage. This failure of insurance coverage was the precipitating and dominant factor in the loss of the Aenos Towing business.

It was also brought out in cross-examination that Aenos may have been seeking to secure financing in order to obtain a yard in which to perform the City contract. Aenos Towing would need a very large yard, about "one city square block, almost 250,000 square feet." (Tr. at 220), or 112,000 square feet as in the letter from the Aenos attorney.

Also, it was revealed that Aenos financed its trucks through a company called Rule Transfer, Inc. It seems that Rule Transfer purchased the trucks and leased them to Aenos, who paid about $10,000 per month to lease the five trucks. Aenos had five truck drivers for the five trucks at $10.00 per hour and two supervisors, including Moreno. There were also "scouts" who were paid $10 to $15 per vehicle for about 50 vehicles per scout per week.

Aenos Towing was paying insurance premiums of about $42,000 plus $12,400 for financing the premiums for a total of $54,000 per year. Apparently Florida Funding Associates was a finance company that was helping Aenos fund its insurance premiums at 24% interest. Aenos could not

9

afford to pay AIU Insurance Company directly because it wanted three payments per year, and that was beyond their ability to pay. So Aenos financed the premiums through Florida Funding, making nine payments per year. Apparently, in March 2003 Florida Funding wrote to Aenos that their insurance would be cancelled if not paid by March 26, 2003. (Dft's Ex. C). Also, on April 9, 2003, it appears that their insurance on the yard and the trucks was cancelled for non-payment. (Dft's Ex. E). This was a year before the City cancelled the tow truck contract in March 2004.

Moreno testified that his brother George took care of the financial arrangements for Aenos Towing and his brother "doesn't remember some of the stuff from back then." (Tr. at 243).

In response to objections to some of his questions by the Assistant United States Attorney, defense counsel stated:

> MR. PERINI: Your Honor, very simply, we don't deny that some money was not sent where it should go. But at the end of the day, AIU was out $15,000 not $150,000. Not every bit of the premium.
>
> There was insurance on these vehicles. I'm not claiming my client is not innocent; we're not responsible for the business going down the tube. And we're not responsible for over $5 million.

THE COURT: I'm going to allow it.

(Tr. at 244-45).

On April 12, 2003, Florida Funding sent a cancellation notice to Aenos Towing. (Dft's Ex. F). Then on April 22, 2003, Cross County sent a fax to Aenos advising it to pay $10,704.64 to Cross County "by 2 pm tomorrow." (Dft's Ex. G). Moreno testified that he was unaware of this apparent problem or other problems raised by defense counsel. His brother George handled these problems. However in evidence are suspension orders in July of 2003. Moreno told his brother George to handle it. Apparently, there were periodic difficulties in insurance payments by Aenos Towing,

10

which Moreno did not know about. The Aenos attorney Gary Rosen did tell him that some other towing companies were having troubles with Bielli's brokerage firm.

Even though Aenos Towing was receiving approximately $90,000 to $100,000 a month from the Sheriff under the City contract, it was being spent to run the business. So that the $5,145,276.56 that Aenos expected to receive from the City during the course of the tow truck contract, was the gross amount of money that Aenos expected to receive. However, apparently, Aenos was spending all the gross money coming in just to run the business, with no profit; except "on a projection basis." (Tr. at 289). Moreno conceded that for the period of the City contract "there was no profit." (Tr. at 290).

On redirect examination it was brought out that in 2003 and 2004 Aenos Towing did have positive bank balances; did have a profit for certain months; and was earning money every month. For example, the Aenos ending bank balance as of December 4, 2003 was $32,580. However, the balance was only $563.17 on December 3, 2003. Also, in 2003, Aenos made at least $30,000 in insurance payments. However, in fact, Aenos was not making a profit at that time.

There were other serious problems in the Aenos Towing business. Aenos secured new insurance with Comfort Zone Insurance Company. Initially, the City suspended its contract for 90 days and then the City found another company to take the place of Aenos. However, if Aenos paid the back insurance payments of $16,000, it could go back to towing; only if an agreement could be worked out with the landlord of the yard.

During this critical time in March 2004, after the cancellations, Moreno did not call Cross County until March 18 or 19, 2004. Although Aenos was not making a profit in 2003 and 2004, the company was giving salaries to Moreno, his brother George, and the five drivers, the scouts and the

11

other employees, besides paying monthly rent of about $25,000 for the yard; and monthly payments on the trucks in addition to other monthly bills.

This all came to a head in mid-March 2004, when Moreno had to pull all his trucks off the road, because all of his registrations were suspended "for lack of insurance payment." (Hr'g at 330).

## II. THE STIPULATIONS

In a letter to the Court from Assistant United States Attorney Charles N. Rose, dated January 20, 2012, the Court was advised that the parties had come to an agreement with respect to the loss and restitution amounts for all but two of the victims named in the plea agreement, namely, Aenos Towing and Florida Funding Associates. The agreed upon loss and restitution amounts for the fourteen victims is a combined loss of $328,480 and combined restitution of $350,123.81.

On December 15, 2011, both parties submitted a stipulation agreeing that the loss and restitution for Florida Funding Associates were both the sum of $58,613. Therefore, the parties agreed that, except for the loss and restitution amounts attributed to Aenos Towing, the defendant was responsible for a loss of $909,093 and restitution of $930,736.81.

## III. DISCUSSION

The burden of proof in this Fatico hearing is on the Government to establish the facts required to support the base offense level, in this case the amount of the loss, by a preponderance of the evidence. U.S. v. Shonubi, 998 F.2d 84 (2d Cir. 1993); U.S. v. Carmona, 873 F.2d 569 (2d Cir. 1989); U.S. v. Lee, 818 F.2d 1052, 1057 (2d Cir. 1987) cert. den., 108 S.Ct. 350 (1987).

In addition in the 2004 Sentencing Guidelines Manual, Application Note 3(A), provides as follows:

> 3.  Loss Under Subsection (b)(1). – This application note applies to the determination of loss under subsection (b)(1).

   (A) <u>General Rule</u>. – Subject to the exclusions in subdivision (D), loss is greater of actual loss or intended loss.

     (I) <u>Actual Loss</u>. – "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

*   *   *   *   *

     (iv) <u>Reasonable Foreseeable Pecuniary Harm</u>. – For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

Application Note 3(C) also states:

 (C) <u>Estimation of Loss</u>. – The court need only to make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. <u>See</u>, 18 U.S.C. § 3742(e) and (f).

Thus, the loss to a victim in the sentencing phase need not be calculated with absolute precision. As stated in <u>United States v. Guang</u>, 511 F.3d 110, 123 (2d Cir. 2007), "A district court need not establish the loss with precision but rather 'need only make a reasonable estimate of the loss, given the available information.'" <u>Id</u>. (quoting <u>United States v. Carboni</u>, 204 F.3d 39, 46 (2d Cir. 2000)).

 For example, in <u>United States v. Bryant</u>, 128 F.3d 74, 76 (2d Cir. 1997), it was stated that:

 In keeping with this philosophy, it is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown.

<u>Id</u>.

**A. The Defendant's Contentions**

As stated by counsel for the defendant Arthur Bielli in his opening statement, the defendant argued that there was no loss with regard to the alleged victim Aenos Towing, as follows:

> They reported they went out of business due to the offense. In regard to the Aenos Towing, the events cost him in excess of $5 million.
>
> I think, your Honor, at the end of the testimony, you will find that Aenos picked up the towing contract with the City that was too big for them; that they were always in arrears in all payments; that their checkbook would go down to zero; that the checks to the carrier, or to Mr. Bielli, were always late.
>
> At the end of the day, they lose a contract not because they don't have insurance on the vehicle but because they don't pay a $4,000 mechanic's lien that is outstanding from January until March of '04.
>
> The landlord says, you have 30 days to pay that four grand to get rid of the mechanic's lien. They do not. They are evicted, or the eviction proceedings start. And when they no longer have a yard in July, the City says, by the condition of your contract, you must have a yard to put these cars in. You don't.
>
> They are out. No mention of insurance.

(Hr'g at 7).

I think that is what this hopefully today will demonstrate, your Honor.

In addition, the defendant contends that Aenos should be estopped from claiming future earnings under the City contract as a result of fraud on the part of Aenos. Also, the defendant asserts that the proof at the Fatico hearing revealed that Aenos would suffer no "reasonably foreseeable pecuniary harm" because it made no profit from the City contract and would have no profit due to its own sundry business problems.

**B. Findings**

After a review of all the evidence taken at this Fatico hearing, the Court makes the following findings:

Prior to the year 2000, Aenos Towing had three trucks and did "tow-truck" work for taxi companies and parking garages. In 2000, Aenos obtained the towing contract with the New York City Police Department. The contract involved the pickup of derelict vehicles and stolen vehicles. Aenos towed these vehicles to its holding yard in Astoria, where the vehicles would be kept for about 15 working days. Aenos Towing was paid about $80 per vehicle and more if the owner claimed the vehicle prior to the 15 day period.

The Court finds that, in addition to its usual towing business, on March 10, 2003, Aenos Towing entered into a contract with the City of New York to perform towing services. The contract is in evidence as Government Exhibit 2. The contract period was for 3 years and 45 days. The prices were $132.50 for each vehicle towed. It was projected that there would be 8,850 vehicles towed per year. Therefore, the projected gross income for the 3 years and 45 days was the sum of $3,517,875. In addition, there were aborted tows at $57 per vehicle, estimated to be 950 vehicles per year for a total of $162,450 during the term of the contract. So that the estimated total gross payments to Aenos Towing under the City contract during the entire term of the contract was $3,680,325.

The Court finds that this contract was cancelled by the City of New York as a result of the failure of the defendant to forward the insurance premiums paid by Aenos Towing. The Court also finds that Aenos did not obtain the contract with the City by fraudulent conduct. The Court rejects that contention by the defendant.

In addition to the large potential sum of money apparently lost to Aenos Towing as a result of the defendant's conduct, the Court notes that Aenos Towing expended a substantial sum of money in preparing for the City contract. Aenos had to lease a large yard to accommodate at least 1,000

15

cars for which it paid rent of $25,000 per month. Aenos had to do improvements to the leased yard in the sum of approximately $17,000. In addition, Aenos had to purchase a trailer and five new trucks at a cost of approximately $180,000.

With regard to the defendant's contentions, the Court finds the following: (1) the towing contract was not "too big for them"; (2) although Aenos Towing was in arrears at some times during the period of this towing contract, this did not prevent Aenos Towing from performing towing under the terms of the City contract; (3) the late checks to Bielli were not a competent producing cause of the default under the City contract; (4) the failure of insurance broker Bielli to forward the premiums was the cause of the default in the City contract; and finally (5) the dispute involving the $4,000 mechanic's lien was not the competent producing cause of the cancellation of the towing contract for Aenos Towing – the criminal acts and fraud on the part by Bielli in failing to forward the premiums was the cause of the City default and the potential loss of substantial money by Aenos Towing.

The big problem for the Government is the estimate of the "losses" of profits to Aenos Towing if the contract had been performed for the three year period of the towing agreement. The Court has indeed determined that the failure to pay for the insurance coverage by the defendant was the competent cause of the cancellation of the contract by the City, not the fault of Aenos Towing. This occurred when the Aenos trucks were forced off the road as a result of the defendant's failure to maintain the insurance coverage. Further, the failure to pay the $4,000 lien occurred after Aenos was forced to pull its trucks off the road on or about March 18, 2004 due to the defendant's failure to provide the required insurance coverage.

Although the Court finds that the defendant's failure to provide the required insurance

coverage was the proximate cause of the cancellation of the City towing contract, the damages – especially the loss of profits – remain problematic. On cross-examination, Moreno conceded that he did not file personal federal, state and city tax returns for the years 2002, 2003 and 2004. During those years he was earning between $50,000 and $75,000 per year and paying no income tax. In addition, there were judgments filed against him for failure to pay the amounts due on his credit cards. Also there were federal tax liens filed against Aenos in 2002 and 2004. One lien was for $12,490 filed on February 2, 2004. In addition, there was a warrant against Aenos Towing from the New York State Taxation Department in the amount of $3,114. Also, there was a series of warrants filed against Aenos. Clearly, Aenos and Moreno were in serious financial distress. How long could these financially unsavory situations continue? If Moreno was in trouble with his taxes and other problems and unable to work, who would manage the business? If Aenos Towing was in financial distress, how long could it continue to survive and perform the towing agreement with the City of New York.

Further, Florida Funding Associates was helping Aenos fund its insurance premium at 24% interest. In March 2003, Florida Funding wrote to Aenos that the insurance would be cancelled if not paid by March 26, 2003. In fact, it appears from the evidence that the insurance on the yard and the truck was cancelled on about March 2003 for non-payment of premiums by Aenos Towing. This was a year before the City cancelled the tow truck contract in March 2004. Strangely, Moreno states that he was unaware of this or any other problems.

Significantly, Moreno testified that Aenos Towing was spending all the gross money coming in from the City just to run the business, with no profit except on a projection basis. In fact, of importance, Moreno conceded that for the period of the City contracts, "there was no profit."

17

Q. This is where you tell us that you project total -- and I don't know how to characterize it, but we're looking at potentially, at the end of the day, $5,145,276.56. You are talking about the gross moneys that you expect to get from the City, correct?

A. On this number?

Q. Yes.

A. Projected losses.

Q. No. Strike that.

Isn't this actually the gross amount of money, every nickel, every penny, that you anticipate into the future some six years, that you expect to get from the City?

A. Yes.

Q. It's not profit; it's gross?

A. Yes, correct.

Q. All right. So you've already testified that in 2003 and 2004, through February, you were spending all of these gross moneys coming in just to run the business. There was no profit, correct?

A. Yes, I was spending from the moment of the contract to the moment that it was ceased.

Q. And the company had -- or realized no money in their pocket, correct?

A. No.

Q. All right. What were your profits, if you were spending all the money coming in?

A. Well, it was on a projection basis.

Q. Sir, you had the business up and running for two years, or a year and a half.

Did you realize any profits in that time period?

A. There were no profits.

18

(Tr. at 288, 289 and 290).

Therefore, based on the evidence adduced at the <u>Fatico</u> hearing, the Government failed to prove, by a preponderance of the evidence, that Aenos Towing would have made a profit, even if the contract was performed.

Accordingly, the Court finds that the amount of the loss with regard to the cancellation of Aenos Towing contract with the City of New York is as follows:

(1) The moneys expended by Aenos Towing in preparation for the City contract – the sum of $197,000, which sum is calculated as follows:

(a) Aenos had to lease a large yard to accommodate a large number of towed cars. Aenos leased the Kent Avenue property in or about March 2003 at a rental of $15,000 per month. For the 15 month period from March 2003 to July 1, 2004, which was the sum of $225,000.

(b) Aenos made improvements to the leased Kent Avenue yard in the sum of approximately $18,000.

(c) Aenos purchased a trailer for about $6,000.

(d) Aenos purchased "about" five new 2008 trucks for about $30,000; a medium tow truck for the sum of $45,000; and a flatbed truck for the sum of $60,000.

(2) The total of the Aenos-City of New York contract losses is the sum of $309,000. The loss as stipulated by both sides on December 15, 2011 in the sum of $909,093 for all victims other than Aenos Towing. So that the final figure for the losses attributable to the defendant are as follows:

| | |
|---|---|
| Aenos Towing loss | $ 309,000 |
| Losses to all other vehicles | 909,093 |
| Total loss for guideline purpose | $1,218,093 |

19

## III. CONCLUSION

The Court finds that the Government has established, by a preponderance of the evidence, that a reasonable estimate of the total amount of loss caused by the criminal acts of the defendant Arthur Bielli is the sum of approximately $1,218,093.

**SO ORDERED.**

Dated: Central Islip, New York
February 8, 2012

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge